IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Diamantoulis,<br><br>    Plaintiff,<br><br>vs.<br><br>Qwest Communications, Inc.,<br><br>    Defendant. | CV-07-0272-TUC-FRZ (JCG)<br><br>**REPORT & RECOMMENDATION** |

Pending before the Court is a Motion for Summary Judgment filed by Defendant Qwest Communications, Inc. ("Qwest") on May 15, 2009. (Doc. No. 58.) Plaintiff Maria Diamantoulis ("Diamantoulis") filed a response on June 16, 2009 (Doc. No. 60) and Defendant timely replied. (Doc. No. 61.)

Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Guerin for a Report and Recommendation. (Doc. No. 63.) The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an order granting Defendant Qwest's Motion for Summary Judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

Diamantoulis has been employed by Qwest, or its predecessor, for approximately 30 years, and since 1996 she has worked as a Network Technician ("Net Tech") in Tucson,

Arizona. (DSOF 1; PSOF 1.)[1] In approximately 1999, Diamantoulis voluntarily transferred from a Net Tech position in the Installation and Maintenance Department to a Net Tech position on the Open Trench Crew in the Construction Group. (*Id.*) Diamantoulis remained in the Construction Group until she applied for and obtained a position as a Fiber Splicer in April, 2008, where she still works today. (*Id.*)

In 2003, Peggy Edwards became Diamantoulis' supervisor. (DSOF 4; PSOF 4.) Like Diamantoulis, Edwards is a woman in her fifties with more than 30 years of service with Qwest. (*Id.*) Edwards remained Diamantoulis' supervisor until approximately November, 2006. (*Id.*) During the time she was her supervisor, Edwards never disciplined Diamantoulis. (*Id.*)

Edwards supervised three construction crews: the aerial crew, responsible for installing telephone lines on telephone polls; the open trench crew, responsible for laying long lines in open trenches; and the underground crew, responsible for installing cables under streets and in manholes. (DSOF 5; PSOF 5.) Each crew had separate schedules. (*Id.*)

In February, 2003, Edwards asked Diamantoulis if she would like to work in the construction crew office, rather than in the field. (DSOF 6; PSOF 6.) Diamantoulis agreed, and worked in the office until approximately March, 2005. (*Id.*) Diamantoulis' office schedule changed on several occasions, alternating between a "4/10" schedule (four days, ten hours each) and a "5/8" schedule (five days, eight hours each). (DSOF 7; PSOF 7.)

In March, 2005, Diamantoulis sided with another employee regarding two complaints he filed against Qwest with the Arizona Corporation Commission. (DSOF 22; PSOF 22; DSOF Ex. M.) According to Diamantoulis, Edwards was upset with her for siding with the

---

[1] Citation to the parties' statements of facts are abbreviated herein as follows: Defendant's Statement of Facts (Doc. No. 59), "DSOF"; Plaintiff's Statement of Facts in Opposition to Defendant's Summary Judgment (Doc. No. 60-1), "PSOF"; Plaintiff's Separate Statement of Facts in Opposition to Defendant's Summary Judgment (Doc. No. 60-2), "PSSOF"; Defendant's Reply in Support of its Statement of Material Facts and in Response to Plaintiff's Separate Statement of Facts (Doc. No. 62), "DRSOF".

co-worker instead of with Edwards. (DSOF, Ex. M.) Diamantoulis testified that she did not have any problems with Edwards until March, 2005. (DSOF, Ex. A, pg. 56.)

According to Diamantoulis, in April 2005 she was assigned to the open trench crew by Edwards. (PSOF 6.) According to Edwards, Diamantoulis chose to switch from office work to trench crew in order to continue working a 4/10 schedule. (DSOF 6.) Edwards testified that her supervisor, Wendell Nelson, instructed Edwards that the person working in the office should work a 5/8 schedule, rather than a 4/10 schedule, in order to reduce overtime expenses. (DSOF 8.)[2] On May 4, 2005, Edwards sent an email to several Qwest employees, including Diamantoulis, stating "if anyone is interested in working 5/8's in the office please let me know." (DRSOF, Ex. R.)

Diamantoulis testified that she was not permitted to work as much overtime as other, male members of her crew. (PSOF 11.) According to Qwest, between March, 2005 and May, 2007, Diamantoulis had the second highest number of overtime hours of employees on her crew. (DSOF 11.)[3] On May 4, 2005, Edwards instructed employees that no overtime

---

[2] DSOF 8 cites to portions of Wendell Nelson's deposition in support of this statement; the cited portions are either not included in the record or do not appear relevant to Qwest's overtime policy. Plaintiff acknowledged at her deposition, however, that she was told in 2005 by Ms. Edwards that Mr. Nelson wanted a person in the office on a 5/8 schedule and was told the same in 2006 by Mr. Nelson. (DSOF, Ex. A, pg. 36-37.)

[3] In support of this assertion, Qwest cites to DSOF Ex. H, which documents overtime hours for a number of Qwest employees between March, 2005 and May, 2007. The document does not clearly support Qwest's assertion as several employees (who are not identified by crew) are listed as having more overtime hours than Diamantoulis. Moreover, Qwest's assertions in DSOF 11 that Plaintiff had the highest number of overtime hours on her crew in 2005 and the second highest number of overtime hours on her crew from March 2005 to May 2007 are not supported by the portion of Diamantoulis' deposition cited. Diamantoulis, however, does not dispute either of these specific statements. *See* PSOF 11. Rather, she disputes only that the deposition testimony cited by Qwest states what is alleged. *Id.* Morever, in her Opposition, Diamantoulis asserts only generally that she was denied overtime (Opp. at pg. 5, l. 11; pg. 11, l. 6; pg. 12, l. 9) and that other employees worked significant overtime. (Opp. at pg. 8, l. 19). She does not assert that the other employees were similarly situated, only that the question of similarly situated is one of fact. (Opp. at pg. 8, l. 25 - pg. 9, l. 3.) In contrast, Qwest provides specific facts regarding the allegedly similarly situated employees. *See* Section A3, *infra*.

1  was available and that any required overtime other than repair work had to be approved by
2  her prior to working. (DRSOF, Ex. R.)

3  According to Diamantoulis, Qwest employees are permitted to select their shifts based
4  on their seniority. (DSOF, Ex. A, pg. 59.) Diamantoulis likes to work the earliest shift
5  possible so that she can leave work as early as possible. (*Id.* at pg. 62.) Diamantoulis
6  testified that another employee, Patrick Gougeon, was permitted to work a special schedule
7  that allowed him to start earlier than 6 a.m. (the earliest posted shift) despite the fact that
8  Diamantoulis had more seniority than Gougeon. (*Id.* at pgs. 59-63.) Edwards testified that
9  employees cannot start work earlier than 6 a.m.; although some employees like to arrive at
10 the office early, they cannot actually start working before their designated shift start time.
11 (DSOF Ex. F, pgs. 83-85.)

12 All Qwest employees are bound by the Qwest Code of Conduct, which includes
13 policies prohibiting discrimination, harassment and retaliation. (DSOF 3.) Peggy Edwards
14 opted not to sign documentation of the policy; however, it is undisputed that all Qwest
15 employees are bound by the policy. (PSOF 3; DRSOF 3.)

16 Diamantoulis is a member of the bargaining unit represented by the Communication
17 Workers of America ("CWA") and her employment is therefore governed by the collective
18 bargaining agreement between Qwest and CWA. (DSOF 2; PSOF 2.) Diamantoulis filed
19 grievances with CWA on March 24, 2005 and June 16, 2005. (DSOF 2, Ex. C; PSOF 2.)
20 Wendell Nelson filed grievances on Diamantoulis' behalf on July 29, 2005 and April 26,
21 2006. (*Id.*) The Union declined to pursue any of the grievances to arbitration. (DRSOF, Ex.
22 P.)

23 In August, 2005, Diamantoulis filed with the Qwest Law Department an internal
24 complaint alleging gender and age discrimination. (DSOF 10; PSOF 10.) The complaint
25 included allegations that: (1) Edwards questioned Diamantoulis' time; (2) Edwards
26 permitted male co-workers to work overtime but not Diamantoulis; (3) Edwards allowed a
27 male co-worker to work an earlier shift than Diamantoulis; (4) Edwards would give
28 instructions and work folders to men on Diamantoulis' crew despite Diamantoulis' seniority;

(5) Edwards accused Diamantoulis of refusing work; and (6) Edwards singled out Diamantoulis and required her to get a commercial driver's license. (DSOF 14; PSOF 14.) The Qwest Law Department investigated Diamantoulis' complaint, and found no violation of company policy. (*Id*.)

In October, 2005, Diamantoulis broke her foot and was off work for four weeks. (DSOF, Ex. A, pg. 90.) When she returned to work, she was assigned to light duty. (*Id*. at pg. 94.) According to Diamantoulis, Edwards refused to allow her to perform her light duty work in the office, despite the fact that other male employees and/or employees who had not complained about Edwards were permitted to perform light duty work in the office. (*Id*.) Edwards testified that it was not within her authority to determine whether someone was eligible for light duty; she was responsible for locating light duty work for Diamantoulis to perform. (DSOF, Ex. Q, pgs. 61-63.) According to Edwards, she located work for Diamantoulis in the Rincon and Wetmore yards; after Diamantoulis complained to the union that she could not perform the assigned work with her crutches, Edwards located other work for Diamantoulis in the Glenn yard, where she worked light duty until January, 2006. (DSOF, Ex. A, pgs. 93-94, Ex. Q, pgs. 62-63.)

Sometime in 2005, Diamantoulis submitted a transfer request. (DSOF, Ex. A, pgs. 119-121.) The request was denied because the department to which Diamantoulis requested transfer was being disbanded. (*Id*.) Given Diamantoulis' seniority, she could have requested transfer to other crews, but she did not make that request. (*Id*. at pg. 121.)

On January 6, 2006, Diamantoulis filed a Charge of Discrimination with the Arizona Attorney General's Office, Civil Rights Division ("ACRD"), alleging discrimination on the basis of sex and retaliation. (Doc. No. 10, Ex. A.) The Charge alleged that: (1) on March 11, 2005, Edwards denied Diamantoulis' requests to work overtime but allowed male employees to work overtime; (2) on March 15, 2005, Edwards denied Diamantoulis' request to work an earlier shift, but allowed male employees to work an earlier shift; (3) in August, 2005, Diamantoulis complained to Edwards of differential treatment, the complaint was investigated and dismissed; and (4) in November, 2005, Edwards refused to permit

Diamantoulis to work in the office as an accommodation for an injury, told co-workers that the refusal was based upon Diamantoulis' complaint of differential treatment, and permitted male employees to work in the office as an accommodation for injury. (*Id.*) Diamantoulis received a Right to Sue letter from ACRD on October 11, 2006. (PSSOF Ex. 18.)

Diamantoulis testified that in March, 2006, she attended a training led by Edwards. (DSOF Ex. A, pg. 104.) At the close of the training, Diamantoulis refused to sign a form acknowledging that she understood the training because she felt that Edwards had been unable to answer some of the questions asked during the training. (*Id.*) Another co-worker, who was male, also refused to sign the form. (*Id.* at pg. 105.) Edwards called Diamantoulis into the hallway to question her about her refusal to sign the form; according to Diamantoulis Edwards yelled at her. (*Id.*) Later that day, Diamantoulis' right ear went numb and she thought she was having a stroke. (*Id.* at pg. 108.) A co-worker took her to the fire department and then to the hospital. (*Id.* at pgs. 109-111.) Diamantoulis was diagnosed with high blood pressure and was prescribed an anti-anxiety medication. (*Id.* at pgs. 109, 156-57.) She took two days off from work following the incident. (*Id.* at pg. 112.) Diamantoulis did not seek any mental health counseling. (*Id.* at pg. 156.) Diamantoulis never took the prescribed medication. (*Id.* at pg. 157.)

In May, 2006, Diamantoulis reported to Edwards that she believed someone had urinated in the water jug attached to one of the trucks. (DSOF, Ex. A, pgs. 137-38.) The water jug in question was shared by all of the crew working at the work site. (*Id.* at pg. 137.) According to Diamantoulis, Edwards instructed her to remove the water jug from the truck but failed to submit the water for testing within a reasonable time frame. (DSOF, Ex. A, pg. 140.) Edwards testified that she arranged for the water jug to be sent away for toxicity testing and that the water did not test positive for toxins or other substances. (DSOF, Ex. F, pgs. 138-141.)

In approximately May, 2006, following a meeting with CWA representatives, Mr. Nelson requested that the Qwest Law Department investigate Diamantoulis' claims of retaliation. (DSOF 19; PSOF 19.) The Law Department issued a report in March, 2007

concluding that no Qwest policy, including the policy prohibiting retaliation, had been violated. (*Id*.)

In August, 2006, Diamantoulis complained that an unopened box of rat poison was left in the crew room. (DSOF 20; PSOF 20.) A crew member later stated that he was using the rat poison in a cross box for rats or mice and forgot to put it away. (DSOF 20; PSOF 20.)

In October, 2006, Diamantoulis complained that she had discovered a poster in the crew room in which the throats of the people depicted in the poster had been cut. (DSOF 21; PSOF 21.) A crew member later stated that he cut the poster because he was showing a co-worker how sharp his new knife was and he did not intend to direct his actions toward Diamantoulis. (DSOF 21; PSOF 21.)[4]

In November, 2006, Edwards was transferred to a new crew. (DSOF 23; PSOF 23.) Dave Mullin became Diamantoulis' new supervisor. (DSOF 24; PSOF 24.) According to Diamantoulis, Mullin retaliated against her by not advising her of personnel decisions he had made and telling her peers to watch what they said, creating strained relationships with Diamantoulis' co-workers. (*Id*.) Specifically, Diamantoulis claims that her co-workers did not respond to her when she said good morning, watched her walk into the office and sat outside in the afternoon. (*Id*.) Diamantoulis also testified that Mullin told her not to file an EEO complaint, or he would be fired. (PSOF, Ex. 2, pg. 123.)

On February 15, 2007, Diamantoulis filed a second Charge of Discrimination with the ACRD, alleging retaliation for the filing of her January 6, 2006 ACRD Charge. (DSOF 25; PSOF 25.) The February 15, 2007 Charge alleged that Mullin was retaliating against Diamantoulis by not advising her of decisions and fostering a hostile work environment. (Id.; *see also* DSOF Ex. N.) Diamantoulis received a Right to Sue letter from ACRD on July 23, 2007. (PSSOF Ex. 20.)

---

[4] Diamantoulis alleges that the rat poison and the poster were left in her work area, however Diamantoulis acknowledged that the crew room was used by the whole crew. (PSOF 20 & 21; *see also* DSOF Ex. A, pg. 129.) There was no testimony that Diamantoulis had any separate work area within the crew room.

- 7 -

In May, 2007, Mullin retired from Qwest and Sandra Heinz became Diamantoulis' supervisor. (DSOF 27; PSOF 27.) Diamantoulis reported to Heinz until April, 2008, when she voluntarily transferred to another crew. (*Id*.) Diamantoulis has no complaints about her employment after April 2007 and is happy in her new position. (*Id*.)

Diamantoulis filed an action against Qwest in Pima County Superior Court on January 3, 2007. (Doc. No. 1-3.) On June 8, 2007, Qwest removed the action to federal court. (Doc. No. 1.) Diamantoulis amended her complaint on August 13, 2007 to allege one claim against Qwest for retaliation in violation of Title VII. On May 15, 2009, Qwest filed the pending Motion for Summary Judgment.

**STANDARD OF REVIEW**

In deciding a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987).

Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party moving for summary judgment initially must demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. The moving party merely needs to point out to the Court the absence of evidence supporting its opponent's claim; it does not need to disprove its opponent's claim. *Id.*; *see also* Fed. R. Civ. P. 56(c). If a moving party has made this showing, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Anderson*, 477 U.S. at 256; *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251.

**DISCUSSION**

Qwest contends that Diamantoulis cannot establish a claim for gender discrimination because: (1) Diamantoulis has not suffered an adverse employment action, and (2) Qwest has articulated legitimate, non-discriminatory reasons for its actions. The Magistrate Judge concludes that Qwest is entitled to summary judgment on Diamantoulis' gender discrimination claim because Qwest has articulated legitimate, non-discriminatory reasons for its actions.

Qwest further contends that Diamantoulis cannot establish a claim for retaliation because: (1) Diamantoulis has not suffered an adverse employment action; (2) Diamantoulis cannot establish a causal connection between the alleged protected activity and the alleged retaliatory conduct; and (3) Diamantoulis cannot demonstrate Qwest failed to address her complaints of a hostile work environment. The Magistrate Judge concludes that Qwest is entitled to summary judgment on Diamantoulis' retaliation claim because Qwest has articulated legitimate, non-discriminatory reasons for its actions.[5]

**A.    Gender Discrimination**

In order to state a *prima facie* case of employment discrimination under Title VII, Diamantoulis must show that (1) she belongs to a protected class, (2) she was capable of performing her job, (3) she was subjected to an adverse employment action, and (4) similarly situated people of the opposite gender were treated more favorably. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If established, the prima facie case creates a rebuttable presumption that Qwest unlawfully discriminated against Diamantoulis. *See Lyons v.*

---

[5] As the Magistrate Judge concludes that Plaintiff has failed to state a claim of hostile work environment, this report and recommendation does not address the issue of whether Qwest failed to address Diamantoulis' complaints of hostile work environment.

- 9 -

*England*, 307 F.3d 1092, 1112 (9th Cir. 2002). The burden of production then shifts to Qwest to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If Qwest meets this burden, the presumption of unlawful discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Diamantoulis then must produce sufficient evidence to raise a genuine issue of material fact as to whether Qwest's proffered nondiscriminatory reason is merely a pretext for discrimination. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000). Diamantoulis may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220-22 (9th Cir. 1998). Ultimately, Diamantoulis' burden is to "produce some evidence suggesting that [Qwest's conduct] was due in part or whole to discriminatory intent." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004).

### 1. Diamantoulis' complaint does not allege gender discrimination.

The Court notes at the outset that Diamantoulis' Amended Complaint does not appear to allege a claim for gender discrimination. The Amended Complaint is captioned "Amended Complaint, 42 U.S.C. § 2000e-2, 3, 5(f)(3), Retaliation." Paragraph 1 of the Amended Complaint states "This is an action brought pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) for retaliation for complaining of discrimination." Page 6 of the Amended Complaint alleges only one count – "Violation of Title VII ... the actions of the Defendant, Qwest ... constitute violation of the anti-retaliation provisions of State and Federal Civil Rights Laws. 42 U.S.C. § 2000e-3(a)." On the face of the Amended Complaint, Diamantoulis appears to be alleging only a claim for retaliation. However, Qwest's Motion for Summary Judgment has construed the Amended Complaint as also stating a claim for gender discrimination. In responding to the Motion, Diamantoulis has argued that her gender discrimination claim should survive summary judgment. Accordingly, the Magistrate Judge's Report and Recommendation assumes that Diamantoulis' Amended Complaint includes a gender discrimination claim.

## 2. Diamantoulis has suffered some adverse employment actions, but not a hostile work environment.

The Ninth Circuit has adopted the EEOC definition of "adverse employment action," an "expansive view" which recognizes not only "ultimate employment actions" such as hiring, firing, promoting and demoting, but also actions which materially affect the terms and conditions of employment and "any adverse treatment . . . reasonably likely to deter the charging party or others from engaging in protected activity," as adverse employment actions. *See Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000). Under this rule, lateral transfers, unfavorable job references, and changes in work schedules are all regarded by the Ninth Circuit as reasonably likely to deter employees from engaging in protected activity. *See id.*

Diamantoulis contends that she suffered from adverse employment actions when she was denied overtime, denied her shift preference, moved from the office to the open trench crew and denied appropriate light duty assignments. If Diamantoulis was actually denied overtime, denied a shift preference to which she was entitled based on her seniority, moved from a preferred office position to a crew position and denied the opportunity to work in the office while injured, those incidents could be considered actions which materially affect the terms and conditions of employment and "adverse treatment . . . reasonably likely to deter the charging party." *See Ray*, 217 F.3d at 1242-43 (citing lateral transfers and changes in work schedule as examples of adverse employment actions).

Diamantoulis also contends that she suffered from an adverse employment action because she was subjected to a hostile work environment. Specifically, Diamantoulis contends that: Edwards singled her out and yelled at her at a March, 2006 meeting; the water jug attached to Diamantoulis' truck smelled like urine; rat poison was left in the crew room; a poster in the crew room was vandalized such that the people in the poster appeared to have their throats slit, and Diamantoulis' co-workers ignored her. However, even if the facts as alleged by Diamantoulis are taken as true, the events described are not severe enough to constitute a hostile work environment. In order to prevail on her hostile work environment

claim, Diamantoulis must show that her workplace was "permeated with discriminatory intimidation ... sufficiently severe or pervasive [enough] to alter the conditions of [her] employment and create an abusive working environment." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995). The Court examines frequency, severity and level of interference with work performance. *Brooks*, 229 F.3d at 923.

In the present case, Diamantoulis has not sufficiently alleged that Edwards' treatment was severe and/or pervasive: Diamantoulis identifies only a single incident of being yelled at by Edwards. In addition, even though Diamantoulis subjectively believed that someone had urinated in her water jug, the evidence is undisputed that the water jug did not test positive for any substances. In addition, the water jug did not belong to Diamantoulis, it was shared by all of the crew members. There is also no evidence before the Court that the rat poison or poster-slashing incidents were in any way directed at Diamantoulis; Diamantoulis testified that the room in which both were discovered was used by the entire crew. Finally, even if Diamantoulis' co-workers ignored her, "mere ostracism" is not an adverse employment action. *See Ray*, 217 F.3d at 1244. Accordingly, there is insufficient evidence to support Diamantoulis' claim of a hostile work environment.

### 3. Qwest has articulated legitimate, non-discriminatory reasons for its actions, which Diamantoulis has failed to demonstrate are pretextual.

Although Diamantoulis arguably suffered some adverse employment actions, Qwest has articulated legitimate, non-discriminatory reasons for its actions and Diamantoulis has failed to demonstrate that those reasons are pretextual. First, Qwest presented Edwards' testimony that management made efforts to limit overtime in order to reduce costs. Diamantoulis argues that Qwest's stated reason for denying Diamantoulis additional overtime is pretextual because similarly situated employees earned more overtime than her. According to Diamantoulis, between August 2005 and December, 2005, she worked only 20.16 hours of overtime. (PSSOF r.) During that same time period, Diamantoulis contends

that Harvey Camacho worked 155 hours of overtime, Randy Clarke worked 53.33 hours of overtime and Arturo Martinez worked 39.33 hours of overtime. (PSSOF s-u.) However, Harvey Camacho was not a member of the open trench crew, and therefore was not similarly situated to Diamantoulis. (DRSOF s.) Randy Clarke did not join the open trench crew until October, 2005, and only earned 16.83 hours of overtime on the open trench crew between October and December, 2005. (DRSOF t; PSSOF Ex. 12.) Although Arturo Martinez had 19 more overtime hours than Diamantoulis, he also took only 8 vacation/sick days in the fall of 2005. (DRSOF u.) Diamantoulis was on vacation or light duty assignment for 39 days in the fall of 2005 (DRSOF u); thus, she and Martinez were not similarly situated in terms of their availability to accrue overtime hours. Finally, the Court notes that Diamantoulis does not dispute that she had the second highest number of overtime hours on her crew between March, 2005 and May, 2007. (DSOF 11; PRSOF 11.) In short, there is no evidence in the record from which a reasonable jury could conclude that Qwest unfairly limited Diamantoulis' overtime hours.

Second, Qwest has provided evidence that no shift prior to 6 a.m. existed, and therefore Diamantoulis was not denied a shift preference. Diamantoulis contends that Qwest's stated reason for refusing to allow Diamantoulis to work before 6 a.m. is pretextual, because another employee, Patrick Gougeon, was permitted to start work before 6 a.m. As a threshold matter, the only evidence presented by Diamantoulis to support her assertion that Patrick Gougeon worked an earlier shift is her deposition testimony that she observed Patrick Gougeon in the office before 6 a.m. (DSOF Ex. A, pgs. 62-65.) The Court questions whether this testimony alone is enough to establish that Patrick Gougeon was working an earlier shift as opposed to simply arriving early at work, before his shift started. Diamantoulis testified that she also came into the office before the start of her 6 a.m. shift, and Edwards testified that several employees liked to arrive at the office early for coffee and cigarettes before the start of their shifts. (DSOF Ex. F, pg. 85.) *See Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003) (if plaintiff relies on indirect evidence tending to prove that defendant's stated reasons are unworthy of credence, such

evidence must be "specific" and "substantial" in order to survive summary judgment). In any event, Diamantoulis has not presented any evidence demonstrating that Patrick Gougeon had management permission to both arrive early and leave early such that he was working an earlier shift than Diamantoulis. To the contrary, the evidence consistently demonstrates that no employees were permitted to start work before 6 a.m. Diamantoulis testified that Wendell Nelson told her "if [Patrick Gougeon] wants to do work on his own time, I'm not paying him for it." (DSOF Ex. A, pgs. 60-61.) Several union representatives also told Diamantoulis that 6 a.m. was the earliest shift. (*Id*. at pgs. 62-63.) Edwards also testified that 6 a.m. was the earliest start time. (DSOF Ex. F, pg. 83.) There is no evidence that Qwest's reason for denying Diamantoulis a shift starting before 6 a.m. was pretextual.

Third, Qwest contends that Diamantoulis was moved from the office to the open trench crew because Diamantoulis wanted to continue working a 4/10 shift. Diamantoulis does not allege that this stated reason was pretextual. In addition, the Court notes that one month after Diamantoulis moved to the open trench crew, Edwards sent an e-mail to several Qwest employees, including Diamantoulis, stating "if anyone is interested in working 5/8's in the office please let me know." Thus, the evidence in the record supports Qwest's position that Diamantoulis could have continued to work in the office, rather than out in the field, if she had been willing to work a 5/8 schedule instead of a 4/10 schedule. Diamantoulis offers no evidence that Qwest's stated explanation is pretextual.

Finally, Qwest has stated that no light duty work was available in the office during the time that Diamantoulis was assigned light duty. Edwards' testimony supports this assertion: she stated in her deposition that when Diamantoulis came back to work on light duty, there was "no extra work, no duties to take over ... I didn't have a need." (DSOF Ex. Q, pg. 65.) Edwards also testified that she called other supervisors until she located light duty work in another Qwest facility. (*Id*. at pgs. 62-63.) Diamantoulis has failed to present any evidence suggesting that Qwest's stated reason is pretextual. Although Diamantoulis argues (and Edwards admitted during deposition) that other, male employees had been permitted to do light duty work in the office, Edwards testified that those other employees were so permitted

- 14 -

because Edwards "had a need and had some work there." (*Id*. at pg. 64.) There is no evidence that at the time Diamantoulis was assigned to light duty, Edwards had light duty work in the office but refused to let Diamantoulis perform that work.

In sum, the actions complained of by Diamantoulis may constitute adverse employment actions under controlling law, but Qwest has articulated legitimate, non-discriminatory reasons for those actions which Diamantoulis has failed to prove are a pretext for discrimination. Accordingly, Qwest is entitled to summary judgment on Diamantoulis' claim for gender discrimination.

**B.  Retaliation**

In order to state a prima facie case of employment retaliation under Title VII, Diamantoulis must show that (1) she engaged in a protected activity, (2) Qwest subjected her to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994)). If Diamantoulis properly asserts a prima facie retaliation claim, the burden shifts to Qwest to articulate a legitimate nondiscriminatory reason for its decision. *Id*. If Qwest articulates such a reason, Diamantoulis bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Id*.

**1.  Diamantoulis has suffered some adverse employment actions, but not a hostile work environment.**

Diamantoulis alleges that Qwest retaliated against her for complaining of gender discrimination to Qwest's legal department and the ACRD.[6] For the reasons stated in Section A.2, above, the Magistrate Judge concludes that (1) Diamantoulis arguably suffered some adverse employment actions based on her allegations that she was denied overtime,

---

[6] Diamantoulis also filed grievances with the CWA on March 24, 2005 and June 16, 2005; however, neither grievance alleged gender discrimination. In fact, in both grievances, Diamantoulis alleged that Edwards was denying her overtime and shift preference because Diamantoulis had sided with another employee regarding complaints he filed against Qwest with the ACC. (DSOF Ex. C.)

- 15 -

denied her shift preference, moved from the office to the open trench crew and denied appropriate light duty assignments, but that (2) Diamantoulis did not experience a hostile work environment.

### 2. Diamantoulis can establish a causal connection between the alleged protected activity and the alleged retaliatory conduct.

A plaintiff in a Title VII action can prove that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions in three ways. First, a plaintiff can introduce evidence regarding the "proximity in time between the protected action and the allegedly retaliatory employment decision," from which a jury logically could infer that the plaintiff was terminated in retaliation for his speech. *See Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (citing *Keyser v. Sacramento City Unified School District*, 265 F.3d 741 (9th Cir. 2001) (as amended)). Second, a plaintiff can introduce evidence that "his employer expressed opposition to his speech, either to him or to others." *Id.* Third, the plaintiff can introduce evidence that "his employer's proffered explanations for the adverse employment action were false and pre-textual." *Id.*

Of the conduct found by the Court to be a possible adverse employment action, only two incidents occurred after Diamantoulis filed her first complaint of gender discrimination with the Qwest legal department in August 2005: Diamantoulis continued to be denied overtime in the fall of 2005, and Diamantoulis was not permitted to work a light duty assignment in the office.[7] Both of these incidents occurred close in time to Diamantoulis' first report of discrimination and therefore establish the causal link required by Title VII. *See Villiarimo*, 281 F.3d at 1065 (citation omitted) (timing alone cannot prove causation unless

---

[7] Diamantoulis' allegations of being denied an earlier shift and being moved from the office to the open trench crew both occurred before August, 2005. Diamantoulis' complaints about overtime assignments began in March, 2005 but continued through 2005. Diamantoulis' claims that Edwards yelled at her, that her water jug smelled like urine, that someone left rat poison in the crew room, that someone vandalized a poster in the crew room and that her co-workers ignored her all relate to Diamantoulis' claim of a hostile work environment, which the Magistrate Judge concluded was insufficient for the reasons stated in Section A.2, above.

the adverse employment action occurred "fairly soon after the employee's protected expression.")

### 3. Qwest has articulated legitimate, nondiscriminatory reasons for its actions, which Diamantoulis has failed to demonstrate are pretextual.

However, as explained in Section A.3, above, Qwest has articulated legitimate, non-discriminatory reasons for denying Diamantoulis overtime and failing to provide a light duty assignment in the office and Diamantoulis has failed to demonstrate that those stated reasons are pretextual. Accordingly, Diamantoulis has failed to demonstrate a genuine issue of fact with respect to her retaliation claim, and Qwest is entitled to summary judgment.

## RECOMMENDATION

The Magistrate Judge recommends the District Court, after is independent review of the record, enter an order GRANTING the Motion for Summary Judgment filed by Defendant Qwest (Doc. No. 58) and DISMISSING WITH PREJUDICE.

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. If objections are filed, the parties should use the following case number: **CV-07-272-TUC-FRZ.**

DATED this 1st day of July, 2010.

_____
Jennifer C. Guerin
United States Magistrate Judge